# In the United States Court of Federal Claims

No. 06-155 C
(Filed: June 16, 2008)

| | |
|---|---|
| S & M MANAGEMENT INCORPORATED, Plaintiff, v. THE UNITED STATES, Defendant. | RCFC 56; Partial Summary Judgment; Contract Interpretation; Contract Modification; Delegation of Authority; Implied Authority |

Edmund C. Grainger, III, White Plains, NY, for plaintiff.

Sean B. McNamara, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court in the above-captioned case is Defendant's Motion for Partial Summary Judgment. Defendant seeks a ruling from the court that the plaintiff contractor was required to address all of the disputed items on the postconstruction punchlist. Plaintiff responds that it completed all of the work required by the contract and that all of its work was approved by government representatives. The court concludes that plaintiff has failed to comply with the contract with respect to most of the disputed items, but that genuine issues of material fact remain on two of the issues. Accordingly, for the reasons set forth below, the court grants in part and denies in part defendant's motion.

# I. BACKGROUND

## A. Factual History[1]

Plaintiff S & M Management Incorporated is a Pennsylvania corporation located in Milford, Pennsylvania. Compl. ¶ 1. In September 1999, plaintiff entered into a construction contract with the United States Department of Veterans Affairs ("VA") to replace the lateral steam lines at the Castle Point Campus of the Veterans Affairs Hudson Valley Healthcare System. Id. ¶ 4; App. 4, 353. The VA issued a Notice to Proceed on November 9, 1999, which, among other things, notified plaintiff that Mr. Michael Shaughnessy had been designated as the contracting officer's technical representative pursuant to the contract. App. 355-56. The VA included a copy of the delegation of authority with the Notice to Proceed. Id. at 356.

On October 17, 2001, after construction had concluded, the VA conducted a final inspection. Id. at 357; Compl. Ex. A at 4. Subsequently, in a December 5, 2001 letter, the contracting officer notified plaintiff that "[t]he completed construction was found to be in accordance with the contract drawings and specifications except for the items listed on the enclosed punchlist." App. 357. The contracting officer noted that work on the punchlist items had to be completed within thirty days and that the VA would withhold a detainment fee "from future progress payments to cover the cost of payrolls, daily logs and punchlist items." Id. Plaintiff responded to the contracting officer's letter on December 13, 2001. Id. at 361-63; Compl. Ex. A at 1, 4. After noting that it had addressed most of the punchlist items prior to its receipt of the December 5, 2001 letter, plaintiff identified several issues implicated by the punchlist and noted that it was willing to undertake the associated work as a change. App. 361-63. The contracting officer responded to plaintiff's letter on February 14, 2002. Id. at 373-75. After specifically addressing each of plaintiff's contentions and identifying the relevant contract provisions, the contracting officer asserted that plaintiff still had not "accomplished the majority of the items on the original punchlist," and that if it did not address the items within the next fifteen days, the VA would complete the punchlist items, with plaintiff being responsible for any costs over the allocated amount. Id. Plaintiff, in turn, responded to the contracting officer's letter on February 21, 2002, addressing the VA's positions point by point, and demanding payment pursuant to the contracts payment provision. Compl. Ex. A. After reviewing the contents of plaintiff's letter, the VA's Chief of Planning and Design, Joseph DiLossi, prepared a memorandum for the contracting officer–dated February 25, 2002–commenting on plaintiff's assertions. App. 383-84.

After some time had passed, plaintiff sent the contracting officer a letter, dated August 5, 2002, "asserting its rights to make a written demand" for payment in full pursuant to the contract. Compl. Ex. B. The contracting officer responded to plaintiff's letter on February 25, 2003,

---

[1] The facts are derived from the complaint ("Compl."), the exhibits attached to the complaint ("Compl. Ex."), and the appendix submitted with defendant's motion for partial summary judgment ("App.").

requesting that plaintiff "submit a copy of its claim."[2] Compl. Ex. C. In a March 24, 2003 letter, plaintiff indicated that it had already submitted its claim and provided the contracting officer with another copy of its February 21, 2002 letter. Compl. Ex. D. The issues constituting plaintiff's claim, as discussed in the letters and memorandum, are described below.

**1. Compensators in Manholes 18A, 18B, 18E, 25, and 25B, and Building #1**

The punchlist identified missing compensators in five manholes–Manholes 18A, 18B, 18E, 25B, and 25–and in Building #1.[3] App. 359-60. Plaintiff asserted in its December 13, 2001 letter that the "missing compensators . . . were not part of the contracted for work," explaining that the contract required only the replacement of previously existing compensators, and not the installation of compensators where "there had been none in the past." Id. at 361; accord id. at 363. According to plaintiff, its contract interpretation "was confirmed with Michael Shaughnessey during the administration of the project."[4] Id. at 361; see also id. at 363 (averring that the work in Building #1 "had previously been inspected and approved"). In his February 14, 2002 response, the contracting officer noted that drawings showed compensators in the five manholes, that plaintiff was required to "install all required appurtenances to make the system function," that "the entire steam line that these items [we]re attached to was designed to be replaced," and, thus, plaintiff was required to install the compensators. Id. at 373; accord id. at 374.

Plaintiff contested the contracting officer's contract interpretation in its February 21, 2002 letter, asserting that it was unable to find any contract provision requiring it to "install all required appurtenances to make the system function" and alleging that "[t]he responsibility to ensure the system functions [was] that of the design engineer . . . ." Compl. Ex. A at 1; accord id. at 4. In support of its position, plaintiff first referred to the "General Intention" paragraph in the contract, which provided for "the removal of existing steam lines, connections, hangers, etc., . . . and the replacement with new steam lines, connections, hangers, etc. . . ." Id. at 2; accord id. at 4. Plaintiff also indicated that a legend on the drawings indicated: "Manhole configurations may not be precise, and are intended to depict the general arrangement of piping, valves, connections, etc. On-site inspection of each manhole is recommended to determine locations & conditions of steam system elements." Id. at 2; accord id. at 4. In light of these provisions, plaintiff interpreted the contract to require only the replacement of existing compensators, a position with which, according to plaintiff, Mr. Shaughnessy concurred. Id. at 2; accord id. at 4.

---

[2] The contracting officer's letter was dated February 25, 2002, but it clearly was in response to plaintiff's August 5, 2002 letter. Consequently, the February 25, 2002 date is an error. The court will assume that the correct date is February 25, 2003.

[3] A compensator is a type of expansion joint. See App. 290-92, 361, 509.

[4] It appears that the correct spelling of the technical representative's last name is "Shaughnessy." See App. 356, 530.

In his February 25, 2002 memorandum, Mr. DiLossi reiterated the VA's position that plaintiff was required to install the compensators. App. 383. Expanding on the contracting officer's previous assertions to plaintiff, Mr. DiLossi indicated that (1) "[t]he drawings show compensators in these locations"; (2) the contract "states that the contractor has to install all required appurtenances"; (3) "[a] compensator is an appurtenance" as defined in the contract; and (4) "the entire steam line that these items are attached to was designated to be replaced." Id. In addition, Mr. DiLossi disagreed with plaintiff's assertion that plaintiff was not responsible for ensuring that the system functioned, stating that the contract provided that plaintiff was "responsible for all drawings and calculations from a professional engineer hired by" plaintiff. Id. Finally, Mr. DiLossi questioned plaintiff's assertion that Mr. Shaughnessy approved its work, recommending that the contracting officer obtain proof of such approval from plaintiff. Id.

**2. Valve in Manhole 25**

The punchlist also indicated that a valve was missing in Manhole 25. Id. at 359. Plaintiff contended that it was not required to replace the valve on the main trunk line in Manhole 25, asserting that the contract did not provide for any work on the main trunk line because the line had been replaced at an earlier date. Id. at 362. Plaintiff also asserted that the connection that it made to the existing valve was done "with the consent of the prior contracting officer and his approval of the work performed in authorizing payment." Id. The contracting officer responded that plaintiff was required to install the missing valve in Manhole 25 because the valve was on the drawings and it was on the steam line that plaintiff replaced. Id. at 373. Plaintiff replied that the contract merely required it to connect its work to the existing work in a "neat and workmanlike manner" and that the plans showed an existing valve in the existing main trunk line. Compl. Ex. A at 2. Plaintiff added that its connection to the existing valve was inspected and approved by Mr. Shaughnessy. Id. In his memorandum, Mr. DiLossi reasserted the VA's prior position and then questioned why plaintiff "terminated[d] the piping outside the manhole instead of inside the manhole," a choice Mr. DiLossi characterized as "not done in a workmanship like manner." App. 383.

**3. Pipe Insulation**

Next, the punchlist indicated that plaintiff needed to "[i]nstall outdoor jacketing over all insulation" in the pipe trenches and manholes pursuant to the contract specifications. Id. at 359. Plaintiff asserted that it did not need to install "outdoor jacketing" over the pipe insulation in the trenches and manholes because the "aluminum-jacketed" insulation it used was in compliance with the contract specifications. Id. at 362. Specifically, plaintiff explained that according to the manufacturer's specifications, additional "PVC jacketing" was not required because the insulation was not exposed to the weather. Id. at 362-63. According to plaintiff, Mr. Shaugnessy approved plaintiff's choice of insulation "when he approved payment for its installation and use." Id. at 363. The contracting officer responded that the specifications clearly stated which locations were to be classified as indoor and outdoor, and that both the trenches and the manholes were outdoor locations. Id. at 373-74. Further, the contracting officer noted that the

manufacturer's description of the insulation used by plaintiff did not indicate that the insulation was "aluminum-jacketed," only that it had "[a]n optional factory applied jacket," which "is a white Kraft paper bonded to aluminum foil and reinforced with glass fibers." Id. at 373 (internal quotation marks omitted).

In reply, plaintiff countered that the contract did not define or classify locations as indoor or outdoor. Compl. Ex. A at 3. Thus, plaintiff maintained that it complied with the contract's insulation requirements by installing insulation in both locations with a jacket of "white Kraft paper bonded to aluminum foil, fiberglass reinforced, [and] pressure sensitive adhesive closure." Id. (internal quotation marks omitted). The VA's position did not waver, however, as Mr. DiLossi reiterated in his memorandum that the VA's specifications clearly described indoor and outdoor locations, and that both the trenches and manholes were outdoor locations. App. 384.

**4. Manholes 18B and 18E**

Another punchlist requirement was the reinstallation of Manholes 18B and 18E because they were "not in ground." Id. at 360. Plaintiff asserted it had properly installed the manholes, explaining:

> During the installation of the manholes, because of a joint between the two four-foot sections, with the approval of Michael Shaughnessey, the manholes were set to an approved depth so as to allow for the openings for the piping to be cut in the lower half of each manhole, thereby avoiding potential leaking problems.

Id. at 362. Plaintiff further asserted that "[c]ut sheets of the manholes were provided and approved on July 17, 2000," and that Mr. Shaughnessy inspected and approved its work. Id. In his response letter, the contracting officer disagreed that plaintiff had properly installed the manholes. Id. at 373. Plaintiff maintained its position in its reply letter, asserting that the contract "makes no reference to the depth of installation." Compl. Ex. A at 3. Plaintiff noted that the drawings showed that "the piping and sleeves" were "approximately two (2) feet from the interior floor of the manholes," and thus plaintiff set the depth of manholes, with the "specific consent" of Mr. Shaughnessy, "to allow for installation in that manner." Id. Plaintiff further averred that "[t]he manholes installed were specifically approved for use as a deviation from the cast-in-place requirement" of the contract. Id. In his memorandum, Mr. DiLossi rejected plaintiff's explanation that the potential for leaks justified plaintiff's installation, indicating that the contract "clearly state[d] that there should be a vapor barrier all around the manhole to ensure that there is no leaking." App. 383-84.

**5. Damaged Compensator in Manhole 18C**

The final disputed item included on the punchlist was the replacement of a damaged compensator in Manhole 18C. Id. at 360. Plaintiff asserted that it had already repaired the damaged compensator, noting that it had referred the scratch on the compensator to the

manufacturer and had repaired it pursuant to the manufacturer's instructions.[5] Id. at 363. The contracting officer responded that plaintiff damaged the compensator during installation and was therefore required to install a new, undamaged compensator. Id. at 374. Plaintiff replied that its repair of the compensator pursuant to the manufacturer's instructions meant that the compensator was no longer damaged and need not be replaced. Compl. Ex. A at 3. Mr. DiLossi rejected this explanation in his memorandum, alleging that plaintiff damaged the compensator and thus did not install the compensator in a "workmanship like manner" as required by the contract. App. 384.

**B. Procedural History**

Because the VA did not render a decision on plaintiff's claim, plaintiff filed a complaint in this court on March 1, 2006, seeking the return of retained contract payments in an amount "in excess of $78,000." Compl. ¶¶ 5, 8-9. At the parties' request, see Joint Prelim. Status Report 3, the court stayed discovery pending a ruling on defendant's instant motion, which seeks "an order that conclusively establishes for the purpose of further proceedings in this case that the contract required [plaintiff] to complete the disputed deficiency list items."[6] Mot. 1. The case was transferred to the undersigned on October 23, 2007. After reviewing the parties' briefs, the court requested supplemental briefing concerning the scope of authority of Mr. Shaughnessy and other VA personnel. Briefing concluded on March 5, 2008. The court deems oral argument unnecessary.

---

[5] In its letter, plaintiff referred to another manhole, but a review of the punchlist indicates that plaintiff was referring to Manhole 18C.

[6] Defendant does not contest the court's jurisdiction, and both parties contend that plaintiff's complaint is timely because it was filed within six years of the contracting officer's deemed denial of plaintiff's claim. Def.'s Mot. Partial Summ. J. ("Mot.") 2; Pl.'s Opp'n Def.'s Mot. Partial Summ. J. ("Opp'n") 2. The court agrees that the complaint was timely filed. However, the parties have misstated the relevant limitations period. According to the United States Court of Appeals for the Federal Circuit, "[o]nce a contractor elects to proceed under the Disputes Act, the six-year statute of limitations in 28 U.S.C. § 2501 is not applicable." Pathman Constr. Co. v. United States, 817 F.2d 1573, 1580 (Fed. Cir. 1987). Because plaintiff filed its complaint pursuant to the "deemed denial" provision of the Contract Disputes Act of 1978 ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (codified as amended at 41 U.S.C. §§ 601-613 (2000)), see Compl. ¶ 8, it has elected to proceed under the CDA and is not bound by the six-year limitations period in 28 U.S.C. § 2501.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Defendant moves for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The moving party may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. Id. at 324. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. Id.

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### B. Delegation of Authority

One theme running through plaintiff's letters to the contracting officer and its filings in this court is plaintiff's insistence that any deviations from the contract were approved, via inspection, payment, or otherwise, by Mr. Shaughnessy or another VA representative other than the contracting officer. Because plaintiff raises this defense for almost every purported deficiency, the court finds it appropriate to address plaintiff's contention at the outset.

"Contracting officers have authority to enter into, administer, or terminate contracts and make related determinations and findings." 48 C.F.R. § 1.602-1 (1998). Encompassed within such authority is the power to "execute contract modifications on behalf of the Government." Id. § 43.102; accord Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1260-61 (Fed. Cir. 2005) ("[T]he contracting officer also has the additional authority to modify contracts."). In the instant case, the contracting officer's authority to modify the contract was expressly embodied in the contract's "Changes" clause. See App. 78. Also encompassed within the contracting officer's general authority is the power to "delegate some of [his or her] authority to certain designated

representatives, who act on behalf of the government during contract administration." Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007). The contracting officer's authority to delegate in the instant case was contained in at least two contract provisions. First, the contract's "Representatives of Contracting Officers" clause provided for the designation of a technical representative:

> The contracting officer reserves the right to designate representatives to act for him/her in furnishing technical guidance and advice or generally supervise the work to be performed under this contract. Such designation will be in writing and will define the scope and limitation of the designee's authority. A copy of the designation shall be furnished to the contractor.

App. 98. The contract also permitted the designation of a resident engineer in the "Government Supervision" clause:

> (a) The work will be under the direction of the VA contracting officer, who may designate another VA employee to act as resident engineer at the construction site.
>
> (b) Except as provided below, the resident engineer's directions will not conflict with or change any contract requirements.
>
> (c) Within the limits of any specific authority delegated by the contracting officer, the resident engineer may, by written direction, make changes in the work. The contractor shall be advised of the extent of such authority prior to execution of any work under the contract.

Id. at 88.

To modify a contract, a contracting officer or his or her delegate must possess actual authority to bind the government. Winter, 497 F.3d at 1344. "Such actual authority may be express or implied from the authority granted to that agent." Id. "Authority to bind the government may be implied when it is an integral part of the duties assigned to the particular government employee." Id. at 1346. However, authority cannot be implied in contravention of express contract language. Id. The contractor bears the responsibility of verifying an individual's "authority and the limits of that authority." Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1432 (Fed. Cir. 1998). Indeed, "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). If someone without actual authority to bind the government purports to modify the contract, the government may still be bound by such modification if the modification is ratified by an

individual with (1) actual authority and (2) actual or constructive knowledge of the unauthorized act. Winter, 497 F.3d at 1347; Harbert/Lummus Agrifuels Projects, 142 F.3d at 1433.

As noted above, the contracting officer designated Mr. Shaughnessy as a technical representative.[7] The designation in this case indicated that Mr. Shaughnessy was authorized to (1) monitor plaintiff's performance to assure compliance with the contract's technical requirements; (2) review and approve reports, drawings, and other items requiring approval; (3) assure that changes were not made until the contracting officer issued written authorization; (4) recommend changes to the contracting officer; (5) furnish technical advice relating to approvals of subcontracts, overtime, travel, and other similar items; (6) visit the work site to monitor the contractor's performance; and (7) advise the contracting officer, at the conclusion of the contract, concerning the technical acceptability of the goods and services provided by plaintiff and the status of government-furnished property. App. 530-31. However, according to the designation, Mr. Shaughnessy was not authorized to (1) make changes to the contract; (2) require extras; (3) extend the date for contract completion; or (4) terminate the contract. Id. at 531.

Despite the clear delineation of Mr. Shaughnessy's authority included in the designation, plaintiff advances several reasons why the court should look beyond the designation for additional sources of Mr. Shaughnessy's authority, including that (1) the November 9, 1999 delegation memorandum could be modified orally; (2) an individual without the express actual authority of the United States can modify the terms of a government contract; (3) the inspection and approval of work performed by a contractor by the contracting officer's technical representative or other agency personnel constitutes ratification of modifications to a government contract; and (4) progress payments constitute the ratification of modifications to a government contract. See Opp'n passim. In its supplemental brief, plaintiff relies principally on the decision of United States Court of Federal Claims ("Court of Federal Claims") in Miller Elevator Co. v. United States, 30 Fed. Cl. 662 (1994). See Pl.'s Supp'l Br. passim.

Miller Elevator Co. concerned a contract for the maintenance of fourteen elevators in a federal office building in St. Louis, Missouri. 30 Fed. Cl. at 666. One year into the three-year contract, the government informed the plaintiff contractor that it intended to renovate the building. Id. As a result of mobilization, demolition, and renovation activities, plaintiff performed maintenance and major repairs that were outside the scope of the contract. Id. at 666-67, 671-73. Plaintiff performed this extra work with the oral consent of the building's Assistant Field Officer Manager, who, as the delegate of the contracting officer's representative, had been delegated all of the authority of the contracting officer except "for the specific contract exclusion for modifications . . . ." Id. at 691-92. Plaintiff sought an equitable adjustment for the additional costs it incurred in performing the extra work, but the contracting officer refused to make

---

[7] Mr. Shaughnessy was not, as asserted by plaintiff in its supplemental brief, the contracting officer. See Pl.'s Supplemental Br. Opp'n Def.'s Mot. Partial Summ. J. ("Pl.'s Supp'l Br.") 2.

payment. Id. at 673. Before the Court of Federal Claims, defendant contended that plaintiff had neither "secure[d] prior written approval for the additional work in question," id. at 685, nor "secured adequate authorization from the contracting officer for the extra repairs and additional maintenance," id. at 690.

Initially, the court concluded that because the Assistant Field Office Manager "had repeatedly granted oral authorization for extra work under the instant contract as well as prior elevator maintenance contracts," the government waived the requirement for written authorization and was therefore estopped from "escaping liability for the constructive changes to the . . . contract." Id. at 689-90. The next issue before the court was whether the Assistant Field Office Manager, "despite the specific contract exclusion, maintained the authority to approve additional work outside of the scope of the contract." Id. at 692. The court first noted that the Assistant Field Office Manager had contracting authority to obligate the government for sums less than $2,000. Id. at 692-93. The court then emphasized that the Assistant Field Office Manager

> obviously understood the unique circumstances faced by [plaintiff] in maintaining the elevator systems at the . . . building and strived to cooperate with [plaintiff] in contending with the difficult building conditions. In the performance of these duties, however, [the Assistant Field Office Manager] gave reason for the belief that he maintained authority to approve modifications to the terms of the . . . contract.

Id. at 693; accord id. at 695 (remarking on "the unique circumstances of this case"). Thus, the court concluded that the Assistant Field Office Manager, as "a Government representative with contracting authority . . . , through implied authority, realize[d] the authority to modify the terms of [the] contract." Id. at 694 (citing Branch Banking & Trust Co. v. United States, 98 F. Supp. 757, 766 (Ct. Cl. 1951)); see also id. (concluding that the Assistant Field Office Manager "performed the functions of an informally (impliedly) designated contracting officer"). In short, the court held that plaintiff "present[ed] persuasive evidence of implied authority for all the work required by the [government]." Id. at 692.

The court finds an application of Miller Elevator Co. to the instant case to be problematic for at least three reasons. First, the cases are factually distinct. In Miller Elevator Co., the government requested that plaintiff perform work beyond the scope of its contract. However, here, the government is merely seeking plaintiff's compliance with the existing terms of the contract. Second, unlike in the present case, the contract at issue in Miller Elevator Co. was but one in a series of contracts between plaintiff and the government for elevator maintenance. Thus, the waiver and estoppel arguments applied by the court in Miller Elevator Co. have no place in the instant case where there is no similar course of dealing. Third, the bases on which the court found implied authority in Miller Elevator Co. are not present in the instant case. While the Assistant Field Office Manager in Miller Elevator Co. had contracting authority, there is no indication here that Mr. Shaughnessy or any other VA representative, other than the contracting

officer, had contracting authority. Moreover, the court's finding of implied authority in Miller Elevator Co. was dependent on the "unique circumstances" presented by performing elevator maintenance during unexpected mobilization, demolition, and renovation activities, a situation not present here. Thus, the court finds Miller Elevator Co. inapposite.

Plaintiff's authority-related contentions lack merit for other reasons. First, plaintiff's argument that the terms of Mr. Shaughnessy's November 9, 1999 delegation memorandum could be modified orally, Opp'n 18, is groundless. The contract's "Representatives of Contracting Officers" clause clearly required any delegations of authority to be in writing. In addition, plaintiff provides no legal support for the proposition that such delegations can be modified orally. Further, plaintiff provides no evidence that the contracting officer orally modified the delegation memorandum. Accordingly, the court concludes that oral modification of delegation memoranda was not permitted by the contract.

Plaintiff next argues that because Mr. Shaughnessy or another VA representative other than the contracting officer "inspected," "approved," "accepted," or "repeatedly accepted" its work, id. at 14-18, "there was clearly an understanding between Plaintiff and Shaughnessy and/or any other representative that accepted the work performed, that such representative was authorized to accept this work," id. at 18. In other words, plaintiff argues that Mr. Shaughnessy and other VA representatives had implied authority to bind the government. See Pl.'s Supp'l Br. 5-6 (arguing that "the defendant's representatives had implied authority to approve all of the work performed by the plaintiff including any work deemed to be outside the contract"). However, plaintiff's invocation of implied authority is defeated by the express terms of the contract. See Winter, 497 F.3d at 1346. The contract expressly limited the authority to make changes to the contract to the contracting officer. App. 78. Thus, Mr. Shaughnessy or other VA representatives, to the extent that they approved or accepted work that amounted to a contract modification, lacked the implied authority to do so. Furthermore, to the extent that plaintiff argues that the inspection and approval of its work by Mr. Shaughnessy or another VA representative other than the contracting officer amounts to the VA's ratification of that work, see Pl.'s Supp'l Br. 6-7, plaintiff's argument must fail because plaintiff has not shown that Mr. Shaughnessy or another VA representative had any authority–actual or implied–to bind the government. See Winter, 497 F.3d at 1347; Harbert/Lummus Agrifuels Projects, 142 F.3d at 1433. Moreover, because the contract explicitly stated that government inspections did not "[c]onstitute or imply acceptance," App. 79, that government acceptance was not conclusive in the event that the contractor breached a warranty or guarantee, id. at 80, and that plaintiff warranted that its work "conformed to the contract requirements," id., any approvals in contravention of the contract requirements were invalid.

Plaintiff lastly argues that the VA's progress payments constituted ratification of its work. Opp'n 18. However, the contract's "Payments Under Fixed-Price Construction Contracts" clause prohibited progress payments from "[r]elieving the Contractor from the sole responsibility for all material and work upon which payments have been made or the restoration of any damaged work" or serving as a waiver of "the right of the Government to require the fulfillment of all of

the terms of the contract." App. 57-58. Thus, plaintiff's argument, which runs contrary to the express terms of the contract, is unavailing.

As one final comment, to the extent that plaintiff argues that any other VA representative other than the contracting officer authorized modifications to the contract, plaintiff's argument must fail. Plaintiff has not provided any evidence that the contracting officer delegated any authority, in writing, to anyone other than Mr. Shaughnessy. With that said, the court proceeds to the individual issues raised by plaintiff.

### C. Contract Interpretation

In the instant motion, defendant requests that the court determine whether the issues raised by plaintiff are governed by existing contract provisions, labeling the court's inquiry as "a matter of contract interpretation." Mot. 1. "Contract interpretation is a question of law generally amenable to summary judgment." Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002). In interpreting a contract, the court begins by examining its language. TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006). The court considers the contract as a whole and interprets it "so as to harmonize and give reasonable meaning to all of its parts." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." Id. "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." TEG-Paradigm Envtl., Inc., 465 F.3d at 1338.

However, the contract contains an ambiguity when it "is susceptible to more than one reasonable interpretation," and those interpretations "fall within a 'zone of reasonableness.'" Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999) (quoting WPC Enters., Inc. v. United States, 323 F.2d 874, 876 (Ct. Cl. 1963)). If the contract contains an ambiguity, the court must determine whether that ambiguity is patent. Id. An ambiguity is patent if it is so "'obvious, gross, [or] glaring'" that it creates a duty to inquire. NVT Techs., Inc., 370 F.3d at 1162 (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974)). Thus, if a party fails to inquire about the ambiguous provision, that party's "interpretation will fail." Id. If the ambiguity is not patent and a party shows that it relied upon the ambiguity, then the court applies the general rule that the ambiguity will be construed against the drafter of the contract. Id.

#### 1. Compensators in Manholes 18A, 18B, 18E, 25, and 25B

Defendant argues that the contract required plaintiff to install all of the compensators depicted on the contract drawings. Mot. 14-15. Specifically, defendant contends that the contract specifications explicitly require the installation of "'expansion devices.'" Id. at 14 (quoting App. 282). However, because the contract specifications did not detail the specific

number or location of required compensators, defendant asserts that plaintiff was required to conform to the contract drawings, which did depict compensators in all five manholes. Id. at 14-15 (citing App. 505-06 (contract drawings), 509 (explanation of the contract drawings)). In support of its view that the contract drawings control, defendant relies upon the contract's "like effect" clause, id., which provides: "Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern," App. 76.

Plaintiff disagrees with defendant's interpretation of the contract. First, citing the contract's "General Intention" provision, plaintiff argues that "the Contract required only the removal and replacement of steam lines and connectors–not the installation of new compensators." Opp'n 12 (citing App. 100). Plaintiff further argues that certain disclaimer language on the contract drawings demonstrates the drawings' imprecision. Id. at 13 (citing App. 505-06). Thus, according to plaintiff, the contract drawings are in conflict with the contract specifications. Id.; cf. id. at 14 ("In this case, there is no patent discrepancy [between the contract specifications and the contract drawings], since the Specifications clearly required only the removal and replacement of steam lines and connectors as opposed to the installation of new compensators."). Because of this perceived conflict, plaintiff relies on the last sentence of the "like effect" clause, which gives the contract specifications precedence when the contract specifications and contract drawings are in conflict. Id. at 13-14. Thus, because plaintiff does not read the contract specifications to require the installation of compensators, it argues that it was not required to install the compensators. Id. at 14.

Plaintiff's interpretation of the contract lacks merit on several fronts. As a preliminary matter, the contract specifications clearly contemplated the installation of compensators. The contract's "Scope of Work" section indicated that once plaintiff removed all of the old "steam lines, hangers, connections and appurtenances," it was to then install, among other things, new piping, "hangers, connections, [and] other required appurtenances . . . ." App. 99; accord id. at 100. These installation requirements were reiterated in the contract's "General Intention" provision: "The Contractor shall completely prepare the site for building operations, . . . including . . . the removal of existing steam lines, connections, hangers, etc., . . . and the replacement with new steam lines, connections, hangers, etc., as depicted on the Contract drawings and described in the Contract specifications." Id. at 100. Although neither of these contract provisions refer specifically to "compensators" or "expansion joints," the use of such equipment falls within the general category of "appurtenances." Because the contract does not expressly define "appurtenances" and because the parties did not indicate that "appurtenance" carries a special meaning in the context of steam pipe system removal and installation, the court refers to the word's ordinary meaning: "[s]omething added to a more important thing; an appendage." The American Heritage College Dictionary 70 (4th ed. 2004). In addition to the pipes, hangers, and connections mentioned in the "Scope of Work" section and "General Intention" provision, the contract describes a number of steam pipe system components, such as expansion joints and compensators, App. 290-92, ball joints, id. at 292, valves, id. at 293-95,

steam traps, id. at 294, strainers, id. at 294-95, drip pan elbows, id. at 295, pressure gauges, id., thermometers, id. at 296, pipe anchors, id. at 298, and insulation, id. at 298-99. All of these components, being added or appended to the steam pipe system, are "appurtenances." Thus, the plain language of the contract contemplated the installation of compensators.

Furthermore, the contract specifications and contract drawings unequivocally required plaintiff to install compensators in the five manholes. First, reading the "General Intention" provision together with the "Scope of Work" section, the court finds that plaintiff's definition of "replace" is unduly restrictive. The contract's "General Intention" provision required plaintiff to remove "existing steam lines, connections, hangers, etc." and replace them "with new steam lines, connections, hangers, etc., as depicted on the Contract drawings and described in the Contract specifications." Id. at 100. And, the "Scope of Work" section required plaintiff to remove the old "steam lines, hangers, connections and appurtenances" and install new piping, "hangers, connections, [and] other required appurtenances . . . ." Id. at 99. Thus, plaintiff was required to remove the old steam pipes, connections, hangers, and appurtenances, and then "replace" or "install" new steam pipes, connections, hangers, and–as indicated by the use of the phrase "other required appurtenances" and the abbreviation "etc."–anything else that was required by the contract drawings and the contract specifications. Accordingly, the use of "replace" in one contract provision does not mean, as plaintiff contends, an exchange of identical objects (e.g., one pipe out, one pipe in), but instead refers to the exchange of one object for one or more substitute objects. See, e.g., The American Heritage College Dictionary, supra, at 1179 (defining "replace" as "[t]o take or fill the place of" or "[t]o be or provide a substitute for"). In other words, reading the contract as a whole, "replace" here is akin to "install."

Additionally, plaintiff's interpretation of the disclaimer language on the contract drawings is belied by its plain terms. The disclaimer provides: "Manhole configurations may not be precise, and are intended to depict the general arrangement of piping, valves, connections, etc. On-site inspection of each manhole is recommended to determine locations & conditions of steam system elements." App. 505-06. This disclaimer clearly alerts the contractor to possible variations in the configuration, arrangement, location, and condition of the steam system elements. It does not, however, indicate that any of those steam system elements might be incorrectly included on the contract drawings.

Thus, there is no conflict between the contract drawings and the contract specifications. The contract specifications required the installation of appurtenances depicted on the contract drawings, and the contract drawings contained depictions of compensators in the five manholes. Applying the "like effect" clause, the court concludes that the contract, plainly and clearly, required plaintiff to install compensators in the five manholes.

Despite the plain language of the contract, plaintiff raises an additional argument to support its failure to install compensators in the five manholes: plaintiff contends that "Mr. Shaughnessy agreed with [its] interpretation that no compensators were required where none existed." Opp'n 14. However, as noted above, the contract prohibits Mr. Shaughnessy from

deviating from the contract requirements. In sum, the court finds that plaintiff has not raised a genuine issue of material fact concerning the contract's requirement of the installation of compensators in Manholes 18A, 18B, 18E, 25, and 25B.

### 2. Compensator in Building #1

Defendant concedes that a compensator is not depicted in the Building #1 drawings. Mot. 15. However, citing the contract's definition of "system" and the declaration of Jud F. Lancto, a Supervisory General Engineer with the VA,[8] defendant contends:

> [A] compensator in this location was required to complete the pipe system properly, a contract requirement. The compensator was required because a sufficient length of pipe had traversed the trench running to Building 1 to require a compensator. [Plaintiff]'s failure to install a compensator in this location caused the pipe to pull at its anchor and nearly rupture, which could allow steam to escape and create a safety hazard.

Id. (citations omitted). Even though defendant fails to cite any contract provision to support its statement that "[t]he compensator was required because a sufficient length of pipe had traversed the trench running to Building 1 to require a compensator," plaintiff does not directly contest it. Instead, plaintiff again relies on the language of the contract's "General Intention" provision, the disclaimer language on the contract drawings, the purported applicability of the second sentence of the contract's "like effect" clause, and the opinion of Mr. Shaughnessy for the proposition that the contract did not require the installation of compensators where none previously existed. Opp'n 12-14. The court again rejects these arguments. Thus, because plaintiff has not refuted defendant's contention that the contract specifications required the installation of a compensator in Building #1, the court concludes that plaintiff has not raised a genuine issue of material fact.

### 3. Valve in Manhole 25

Defendant next argues that the contract required plaintiff to install a valve in Manhole 25 as depicted on the contract drawings. Mot. 18-19. A main trunk line ran through Manhole 25, to which two steam lines were attached with a valve. Id. at 7; Opp'n 5; App. 505. The contract required plaintiff to replace the two steam lines. See App. 505 (containing the contract drawing depicting the new pipes). There is no dispute that plaintiff, instead of running the new steam

---

[8] Mr. Lancto's declaration is unclear as to the precise position he holds. Mr. Lancto states: "I am the Chief, Planning and Design Section (Projects Section), for the New York/New Jersey VISN 3, Hudson Valley Health Care System, Department of Veterans Affairs, in Montrose, New York." Decl. Jud F. Lancto ("Lancto Decl.") ¶ 1. It is unclear to the court whether Mr. Lancto is the Chief of the Planning and Design Section for the entire New York/New Jersey Veterans Integrated Service Network or for just the Hudson Valley Health Care System.

lines into Manhole 25 and replacing the connecting valve, terminated the new steam lines, and connected the new steam lines to the existing steam lines, outside of Manhole 25. Mot. 7, 19; Opp'n 5-6, 15. Defendant contends that plaintiff's failure to run new steam lines into Manhole 25 was contrary to the contract drawings, that plaintiff did not connect the new steam lines to the existing work in the "workmanlike manner" required by the contract specifications, and that the contract specifications required the replacement of the valve because it was connected to the new steam lines. Mot. 19.

Plaintiff defends its interpretation of the work required by the contract, arguing: "The main trunk line was previously replaced, and neither the Specifications[] nor the drawings require any replacement work on the main trunk line. Plaintiff was simply required to hook into the existing equipment on the main trunk line and was not required to perform any replacement work." Opp'n 15. Plaintiff's reading of the contract drawings is untenable.

The contract drawings clearly depict new steam lines entering Manhole 25, see App. 505, and plaintiff does not dispute that it was required to replace the steam lines. The contract drawings also clearly depict a valve on one of the new steam lines. See id. Plaintiff cites no contract provision that prohibited it from doing any work in Manhole 25. Thus, plaintiff was required to install the steam lines and valve in Manhole 25.

Despite the clarity of the contract drawings, plaintiff contends that "Mr. Shaughnessy and/or Mr. Rod[] agreed with Plaintiff's interpretation of the Contract, as such representative inspected and approved the work performed."[9] Opp'n 15. The court reiterates that the contract prohibits Mr. Shaughnessy from deviating from the contract requirements. Further, plaintiff has not provided any evidence that Mr. Rod had any authority to modify the contract. Specifically, plaintiff has not identified the position held by Mr. Rod or provided evidence that the contracting officer delegated any authority to Mr. Rod. Thus, the court must conclude that Mr. Rod lacked the authority to modify the contract.

In sum, plaintiff has failed to raise a genuine issue of material fact concerning the installation of the valve in Manhole 25.

#### 4. Pipe Insulation

Defendant contends next that plaintiff did not install the correct type of insulation on the pipes located in the trenches and the manholes. Mot. 21. The contract contains several provisions concerning insulation, two of which are relevant here. First, in the "Insulation"

[9] Plaintiff asserts that Douglas Rod is a representative of the VA. Opp'n 3, 6, 15. Defendant refers to Mr. Rod as an "employee" of the VA. Def.'s Reply Pl.'s Opp'n Def.'s Mot. Partial Summ. J. ("Reply") 8. There is no evidence of Mr. Rod's official position in the record before the court.

subsection of the contract's "Distribution and Transmission Systems (Steam)" section, the contract provided:

> B. Steam, condensate, and drip return piping . . . shall be insulated as follows:
>
> > 1. Piping in concrete trenches with removable covers shall be insulated with calcium silicate pipe insulation, glass cloth or aluminum jacket.
> >
> > 2. Piping in concrete manholes shall be insulated with calcium silicate pipe insulation, glass cloth or aluminum jacket.
> >
> > 3. Exposed piping in walk-through tunnels shall be insulated with fiberglass insulation, all purpose jacket.

App. 304. Second, in the "Insulation Materials" subsection of the contract's "Distribution and Transmission Systems (Steam)" section, the contract described the different types of required insulation jackets:

> E. Jackets for Insulation Exposed to Weather: Minimum 0.016-inch thick aluminum with locking longitudinal joints. . . .
>
> F. All-Purpose Jackets: Fed. Spec. HH-B-100, Type 1. White kraft bonded to aluminum foil, fiberglass reinforced, pressure sensitive adhesive closure.
>
> G. Glass Cloth Jacket: Minimum 7.8 ounces per square yard, 300 PSI bursting strength, weathertight for outside service.

Id. at 299. Defendant contends that plaintiff "installed an 'all-purpose jacket' in the trenches and manholes, [and] not 'calcium silicate pipe insulation' with a 'glass cloth or aluminum jacket' as required by the specifications." Mot. 21. Defendant further asserts that the insulation plaintiff used was "inappropriate for trenches and manholes, which are potentially exposed to the elements." Id.

Plaintiff takes issue with defendant's distinction between insulation suitable for outdoor use (i.e., for use in locations that may be exposed to the elements) and insulation suitable for indoor use. Opp'n 17. Although inartfully argued, plaintiff contends that the contract does not explicitly require that the insulation used in manholes and trenches be covered by the jackets described under the heading "Jackets for Insulation Exposed to Weather." Id. Instead, plaintiff asserts that the jacketing it used–"white Kraft paper bonded to aluminum foil, fiberglass reinforce[d], pressure sensitive adhesive closure"–met the contract requirements for use in manholes and trenches. Id. The court disagrees.

The contract, in the above-quoted "Insulation" subsection, clearly distinguishes between "glass cloth or aluminum jacket[s]," which are to be used in manholes and trenches, and "all purpose jackets," which are to be used in walk-through tunnels. App. 304. Similarly, the "Insulation Materials" subsection of contract defines three different types of insulation jackets: "Jackets for Insulation Exposed to Weather," "All-Purpose Jackets," and "Glass Cloth Jacket[s]." By process of elimination, it is clear that the "aluminum jacket[s]" approved for use in manholes and trenches fall within the "Jackets for Insulation Exposed to Weather" category.

Thus, the sole question facing the court is whether the insulation used by plaintiff in the trenches and manholes can be characterized as "calcium silicate pipe insulation, glass cloth or aluminum jacket." Because the insulation described by plaintiff clearly belongs in the contract's "All-Purpose Jackets" category,[10] see id. at 299 ("All-Purpose Jackets: . . . . White kraft bonded to aluminum foil, fiberglass reinforced, pressure sensitive adhesive closure."), the court concludes that it cannot be so characterized.

Finally, plaintiff again argues that Mr. Shaughnessy's approval of the insulation is sufficient to override these clear contract provisions. Opp'n 17. And, once again, the court must reject plaintiff's argument because Mr. Shaughnessy lacked the authority to modify the contract. Thus, in sum, plaintiff has not raised a genuine issue of material fact regarding its use of insulation.

**5. Manholes 18B and 18E**

Next, defendant contends that plaintiff improperly installed two new manholes: Manhole 18B and Manhole 18E. Mot. 19. Defendant first asserts that plaintiff failed to install a waterproof membrane around the manholes as required by the contract Id. at 20 (citing App. 288). Second, defendant argues that plaintiff should have, in the absence of an express contract requirement, followed the common trade practice of installing the manholes with the tops of the manholes flush with the ground. Id. (citing Lancto Decl. ¶ 14). Defendant contends that reference to trade practice is appropriate when the contract might otherwise be read as ambiguous. Id. (citing Metric Constructors, Inc., 169 F.3d at 752). Finally, defendant argues that even if an ambiguity exists in the contract, the contract's silence as to the depth to which the manholes were to be installed amounts to a patent ambiguity about which plaintiff was required to inquire. Id. (citing Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 502-04 (Ct. Cl. 1963)).

---

[10] Plaintiff has apparently abandoned the argument it raised before the contracting officer that the insulation it used was properly characterized as aluminum-jacketed. See App. 362 (indicating that the insulation manufacturer's specifications described the insulation as aluminum-jacketed"). But see id. at 373 (containing the contracting officer's rebuttal that the insulation manufacturer described the insulation jacket not as "aluminum-jacketed," but as "[a]n optional factory applied jacket [that] is a white Kraft paper bonded to aluminum foil and reinforced with glass fibers").

Responding to defendant's first argument, plaintiff contends that the cut sheets, which were approved by Mr. Rod, depicted manholes that would be installed at a specified depth so as to avoid leaking problems, therefore foreclosing the need to use "the waterproof membranes that Defendant argues were required . . . ." Opp'n 16. Further, plaintiff asserts that "the manholes were ultimately inspected and approved by Mr. Shaughnessy" pursuant to his delegated authority to review and approve "progress reports, technical reports, drawings and other items required for approval." Id.

First, the contract unequivocally requires plaintiff to use a waterproof membrane. See App. 288 ("Place waterproof membrane between mud slab and bottom concrete slab, and continue up sides to top of side walls."); id. at 335-38 (containing the contract section on "Modified Bituminous Sheet Waterproofing"). There are no listed exceptions based upon the depth of manhole installation. Furthermore, as already mentioned, plaintiff has not provided any evidence that Mr. Rod had any authority to modify the contract, and Mr. Shaughnessy, while he had certain approval authority, could not approve work that would amount to a contract modification. Accordingly, plaintiff has not raised a genuine issue of material fact concerning the installation of a waterproof membrane.

In response to defendant's second argument, plaintiff contends that because the contract was silent as to the depth at which the manholes should be installed, and because it denies that it installed the manholes at an improper depth, it has raised a genuine issue of material fact. Opp'n 16. Specifically, plaintiff labels defendant's argument that "'trade practice renders the contract unambiguous'" as "patently absurd." Id. (quoting Mot. 20). Furthermore, plaintiff reiterates that Mr. Rod approved the cut sheets and that Mr. Shaughnessy approved the manhole installation. Id. at 16-17.

The court first addresses its responsibilities when faced with a missing contract term. "When the matter in dispute is not expressly provided for in the contract, it is necessary to determine whether the contractor's interpretation of the contract requirements was reasonable." C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993); see also id. at 1544 (noting that the court's sole inquiry is the contractor's interpretation of the contract). Here, because the contract was silent on the issue, plaintiff interpreted the contract to allow it to install the manholes at any appropriate depth. Opp'n 16. In support of its interpretation, plaintiff provides: (1) the sworn statement of its president, Mr. Salvatore Sciascia, that "[t]he manholes were indeed installed properly," Decl. Salvatore Sciascia ("Sciascia Decl.") ¶ 9; (2) evidence of Mr. Rod's approval of the cut sheets, Sciascia Decl. Ex. A; and (3) allegations that Mr. Shaughnessy approved the installation of the manholes, Opp'n 17. Defendant counters plaintiff's interpretation of the contract via the sworn statement of Mr. Lancto that "[i]t is typical trade practice to install manholes to be flush with the ground." Lancto Decl. ¶ 14. Neither party provided any further evidence regarding the existence or scope of a trade practice for the installation of manholes.

The court gives no weight to the approvals of Mr. Rod and Mr. Shaughnessy, for reasons stated in prior sections of this opinion. Further, the court is not prepared to accept defendant's evidence of trade practice absent further development of the record. Thus, left with examining the plain language of the contract, which does not indicate the depth at which plaintiff was to install the manholes, the court cannot say that plaintiff's interpretation of the contract is unreasonable.[11] Accordingly, plaintiff has raised a genuine issue of material fact with respect to the installation depth of Manholes 18B and 18E.

### 6. Damaged Compensator in Manhole 18C

Finally, defendant contends that plaintiff was required, by the terms of the contract, to replace the compensator in Manhole 18C that was damaged during installation. Mot. 17. Specifically, defendant asserts that plaintiff "gouged the compensator when grinding pipe in a manhole, compromising the compensator's structural integrity." Id. at 18 (citing Lancto Decl. ¶ 11). Defendant also contends that despite plaintiff's claim "that it repaired the compensator 'in accordance with the manufacturer's recommendation,'" id. (quoting App. 380), plaintiff "did not repair the compensator, which was permanently damaged and required replacing," id. (citing Lancto Decl. ¶ 11). According to defendant, plaintiff's failure to replace the compensator violated the following contract provisions: (1) the "Warranty of Construction" clause, in which "the Contractor warrants . . . that work performed under this contract . . . is free of any defect in equipment, material, or design furnished, or workmanship performed" and that "[t]he contractor shall remedy at the Contractor's expense . . . any defect," id. at 80; (2) the "Guaranty" clause, in which "[t]he contractor . . . guarantees that when installed all materials and equipment will be free from defects and will remain so for a period of at least one year from the date of acceptance," id. at 87; and (3) the "Restoration" clause, which requires the contractor "to deliver the work complete and undamaged," id. at 111.

Plaintiff denies defendant's allegation that it damaged the compensator in Manhole 18C "in its entirety." Opp'n 14 (citing Sciascia Decl. ¶ 4). Accordingly, plaintiff contends that this issue is not ripe for summary judgment. Id. Defendant responds that "Mr. Sciascia's conclusory statement does not create a genuine issue of fact," noting that it "offered a detailed statement from supervisory VA engineer Jud Lancto that [plaintiff] gouged the compensator when it was grinding pipe in the manhole." Reply 5. Defendant also noted that its motion cited plaintiff's explanation that it repaired the compensator per the manufacturer's recommendation. Id.

---

[11] Defendant's suggestion that the contract's silence as to the installation depth of the manholes creates a patent ambiguity about which plaintiff was required to inquire is unavailing. In the case cited by defendant, Beacon Construction Co. of Massachusetts, the parties' dispute concerned whether the contract required plaintiff to install weather-stripping around certain windows. 314 F.2d at 502-03. However, the contract was not silent as to whether weather-stripping was required, but instead contained language that could have been interpreted either way. Id. Thus, Beacon Construction Co. of Massachusetts is distinguishable from the instant case.

Furthermore, defendant raised the contents of another letter from plaintiff, in which plaintiff asserted that it had referred the scratch on the compensator to the manufacturer and had repaired it pursuant to the manufacturer's instructions. Id.

The court finds that the record supports the findings that the compensator in Manhole 18C sustained a scratch or a gouge and that plaintiff attempted to repair the scratch or gouge pursuant to the manufacturer's recommendations. However, the contract language cited by defendant does not expressly prevent plaintiff from using a "repaired" product. The court is not prepared to determine, based on the record presently before it, whether the repairs performed by plaintiff were sufficient to bring the compensator into contract compliance. Although Mr. Sciascia's sworn statement lacks specificity, the fact that plaintiff contends that it adequately repaired the compensator to bring it within contract compliance is sufficient to defeat summary judgment. Accordingly, the court finds that there is a genuine issue of material fact concerning whether the repairs attempted by plaintiff cured any defect that would violate the "Warranty of Construction," "Guaranty," or "Restoration" clauses.

## III. CONCLUSION

The contract required plaintiff to install (1) compensators in Manholes 18A, 18B, 18E, 25, and 25B, and Building #1; (2) a valve in Manhole 25; (3) waterproof membranes around Manholes 18B and 18E; and glass cloth or aluminum-jacketed insulation in the manholes and trenches. However, plaintiff has raised genuine issues of material fact concerning the installation depth of Manholes 18B and 18E and the sufficiency of the repairs done to the compensator in Manhole 18C. Thus, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion for summary judgment. By **no later than Friday, July 11, 2008**, the parties shall file a joint status report suggesting further proceedings in this case.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge